# Bentley *vs* White, Assignee.

### APPEAL FROM THE WASHINGTON CIRCUIT.

#### *Partners and Partnership.*

CHIEF JUSTICE ROBERTSON delivered the opinion of the Court.

ON the 8th of August, 1839, James Bentley, who owned 39 mules, two horses and two mares, which he desir-

BENTLEY
*vs*
WHITE, AS'EE.

DEBT.

Case 73.

October 26.

The case stated.

ed to send to the Southern market, entered into a special partnership with John Watts, on the following terms, as expressed by a written memorial signed by each of them, that is, that Watts was to take that stock to the South and sell it, and account to Bentley for $70 on each head, and was to be entitled to one half of the profits over $70 for each head—and also, that as they had purchased "other stock," and *might* "purchase some few more," they would be equal partners in the stock they had so "jointly purchased," or might purchase.

They afterwards bought a few horses jointly, each being present at the purchase, and signing his own name to each bond given for the price. About the middle of August, the purchases were closed, and Bentley told Watts that they would buy no more stock, and that Watts must not sign his (Bentley's) name to "any paper." About the 21st of August, Watts started with the drove for the Southern market; and, on his way about 30 miles, he bought some other horses from Thomas Robinson, and executed a note for $185 therefor, signed "*J. Watts & Bentley.*"

Bentley being afterwards sued on that note by White, as assignee, pleaded *non est factum*, and on the trial upon the issue on that plea, the Circuit Court instructed the jury in substance and effect, that if they believed the foregoing facts, they must find for the plaintiff in the action, and verdict and judgment were accordingly rendered against Bentley for the amount of the said note.

As there was no proof of a recognition by Bentley of that note, or of the purchase which was the consideration of it, or even of the fact that the horses bought by Watts from Robinson were appropriated to the joint use of Bentley and himself, or in any way accounted for with Bentley, it seems to this Court that the peremptory instruction, on the facts as proved, was erroneous.

1. We are strongly inclined to the conclusion, that the contract between Bentley and Watts did not authorize either of them to bind the other by the purchase of horses, even before the drove was started for the South, but should be construed as meaning, as to future purchases, that if the parties should jointly determine to make

other purchases, and should in fact jointly make any, they should be partners in any stock which might be so purchased; and the conduct of the parties tends to fortify that interpretation.

The true legal effect of the written agreement may, however, be material in this case, only to show that the Court erred in giving the *peremptory* instruction, for whatever may have been the effect of it as to the parties *inter se,* there was some evidence that they had held themselves out to the world as partners in a drove to be bought and exported to the South.

2. But whatever may be the true construction and effect of the written, or of the implied agreement, as to future purchases *for exportation,* it cannot, as we think, be extended beyond purchases prior and preparatory to the starting of the drove for the distinct market, or of such others afterwards as might be useful for insuring an advantageous sale of that drove. In its utmost constructive latitude, the contract contemplated no other than a limited partnership, for the purchase of a drove to be carried to the South and there sold. And if, antecedently to the completion of the drove at home, and the starting of it for market, each partner had an implied authority to make purchases for constituting that drove, and thereby to bind the other partner by such contracts; yet as soon as they had determined that the drove was complete, and had started it to the South for sale, the special partnership as to *purchases* ceased, excepting perhaps only so far as might happen to become necessary for selling advantageously the drove so completed and started— as for example, by buying a horse to match one of the drove. We cannot believe, without any extraneous evidence of such an agreement or custom, that in such a case one partner would, as a matter of law, have a resulting authority to purchase any where on the way to market, or at any time before his return home, another drove, or as many other horses as he might choose to buy.

The object of such a special and temporary partnership, clearly limits the right to purchase, and negatives any implied authority to make general purchases after the contemplated drove, (to which alone the contract of part-

*Margin note:*
BENTLEY
*vs*
WHITE, As'EE.

A limited partnership may be formed to buy for a single adventure, (as a drove of stock to a

BENTLEY
*vs*
WHITE, As'EE.

southern mar-
ket,) which if
done, the power
of one partner to
bind the other by
additional pur-
chases, ceases
when the drove
is started.

A limited part-
nership is form-
ed to buy a drove
of horses and
mules for the
south'rn market;
they are purcha-
sed and started
with one of the
partners, who af-
ter going thirty
miles on his jour-
ney, buys two
other horses and
executes the
partnership note,
nothing further
appearing, on
these facts alone
it is error to in-
struct the jury
that both are
bound.

nership applied) had been completed at home, and ex-
ported or started for the place of sale.

If two persons enter into a limited partnership to ex-
port a cargo of ice from Boston to Canton, we could not
believe, that after they had completed the cargo at home,
and their ship had left the home port for the destined
market, one of the partners, without the express authori-
ty of the other, could bind him by a purchase of other
ice on the ocean; or that one partner, in a single adven-
ture of exporting tobacco to New Orleans, would have an
implied authority to buy tobacco on the Mississippi or
Ohio river, on his way to Orleans with the cargo jointly
bought and started for market.

Wherefore, unless there had been conclusive proof of
an understanding in this case, or of some local usage to
the contrary, or of a ratification, express or implied, by
Bentley, the jury were not, in our opinion, bound to pre-
sume that Watts had authority to bind Bentley, by exe-
cuting the note to Robinson, and consequently, we are
of the opinion, that the peremptory instruction by the
Court, and consequently, the verdict and judgment, must
be deemed erroneous. Without the proof of the decla-
ration by Watts, since his return from the South, that the
note to Robinson was given for horses, the law would
have implied that it had been given authoritatively for
some consideration within the scope of the partnership,
and therefore Bentley's counsel was undermining his plea
by objecting to the competency of that declaration,
which was the only evidence of a consideration not em-
braced by the terms and objects of the partnership.

It is, we think, a sound general rule, that after dissolu-
tion, one of the former partners cannot, by his acknowledg-
ments or assertions, impose an obligation on his late
co-partner: *Bell* vs *Morrison*, (1 *Peters*, 373.) But
whether that rule should be applied to the facts of this
case, we need not now determine, because the determina-
tion of it either way, could not affect the question of re-
versal, or any other question that will probably arise on
another trial.

(Judge Ewing dissenting) judgment reversed and cause remanded for a new trial.

*Morehead & Reed* for appellant: *M'Henry* for appellee.

### DISSENT OF JUDGE EWING.

I am constrained to dissent from the opinion just delivered. Bently and Watts were partners in the purchase of horses in Kentucky, with a view to the profit to be derived from their sale in a southern and remote State. They were known to be *partners* in the adventure, and held themselves out as such to the public, by repeated acknowledgments to various persons, and made purchases in Washington and Marion counties *as partners*. Though the two partners might make a contract limiting each other as to the *number* of horses to be purchased, or as to the *time* when they should cease buying, which would be binding, *inter se,* the public cannot look into their private arrangements, or be presumed to know what they are, nor ought individuals who sell upon the faith of the partnership to be bound by them. Trusting each other as partners, it cannot be presumed that the public would know that the powers of either partner to deal in and purchase horses, the subject of their partnership for southern speculation, would terminate with their starting a drove of their horses to market, or that either could not afterwards buy, upon the faith of the firm, and execute a contract, binding upon the firm for the consideration. If the partners, by private stipulation, cannot limit the powers of each other, to an *agreed day,* when their powers to purchase shall cease, so as to affect the public or escape from their partnership liability, neither can they, by private stipulation, that each of them will cease purchasing so soon as a drove is started to market, escape from their partnership liability for a purchase made by either after that period. The public can no more know that the powers of each partner to buy terminates when a drove is *started* than they can know that their powers terminate on an *agreed day*. But there is no express limitation of their powers to buy, to the time of starting a drove to market, to be found in the articles of co-partnership exhibited. The conclusion that their powers are to termi-

nate at that time is to be arrived at by implication only, and it is very questionable whether either, as between themselves, could make the other responsible for buying afterwards, in case a loss should accrue.

From starting a drove to market, it may be presumed by the public that the firm has obtained as many horses as they could obtain upon advantageous terms, or on terms that would be acceptable to them, or that they regard it to their advantage to start those they have to market, still reserving the right and power of each partner to add to the number by purchases on the road, or at home, to be sent on afterwards. But the public cannot know, and should not be presumed to know that the powers of each partner to deal in the very subject of their partnership, ceases that moment a drove is started to market. If the partner who is entrusted with the drove, in the neighbor-hood of their purchases and where they were *known as dealing in partnership,* and within a mile of the place of starting, after he had started, should be offered a good bargain by a neighbor, and should buy upon the faith of the firm, and execute a note for the price in the firm name, and put the horse into the drove, I cannot believe that his partner could escape from liability, upon the plea that the partnership terminated, or the implied power of each partner to buy, ceased by the starting of a drove to market, and that the vendor was bound to know that fact. If he could not escape in the supposed case, upon such a plea, neither ought he to escape when the purchase is made in an adjoining county, where the fact of their partnership may have reached, and have been known to Robinson, the promissee of the note, before he part-ed with his property. And if it was not known to him, the fact existed, and Robinson had a right to rely upon the representations of Watts, an accredited partner, who had been entrusted as such by Bentley, and also en-trusted with the whole of the partnership horses to sell, at least in relation to the subject of the partnership, the pur-chase and sale of horses. And if it was understood that the power of each partner to buy, had terminated, it is to be presumed that the son of Bentley, who was along, would have communicated the fact to Robinson. Be this

as it may, Robinson has been induced to part with his property upon the name and credit of the firm, and most likely upon the name and credit of Bentley mainly, his horses, it is to be presumed, were put into the partnership drove, taken to the South, and their proceeds faithfully applied by Watts, the trusted partner of Bentley, to swell the profits of the partnership adventure, and the firm ought to be made liable for their price. If the proceeds were not so applied, the burthen of showing it should be made to rest upon Bentley, who trusted Watts, and held him out to the public as worthy of trust, rather than upon Robinson, who trusted to the firm name and credit, and not to Watts individually, to show that they were so applied.

If either are to lose, it is better for Bentley, who trusted to lose, than that Robinson who did not, should be made to lose. He who trusts most should lose most, is a sound maxim, and I think is applicable to the parties concerned.

Kentucky was the mart for buying and the South the mart for selling, and contracts for the purchase of horses, which were put into the drove, made by either partner, within the former State or country, *before* or *after* the drove were started to market, are, in my opinion, binding on the firm.